UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
NUNYO DEMASIO,                                               **COMPLAINT**

                                                             **25 cv 6805**

                                                             **ECF Case**
                            Plaintiff,
        vs.

The CITY OF NEW YORK,
MICHAEL DEFALCO, JOSE ROJAS,
in their individual and official capacities,                 **JURY TRIAL DEMANDED**


                            Defendants.
------------------------------------------------------------x

Plaintiff Nunyo Demasio, by his attorney, Cyrus Joubin, complaining of the Defendants, respectfully alleges as follows:

## PRELIMINARY STATEMENT

1. This action arises from various civil rights violations against Nunyo Demasio ("Plaintiff" or "Mr. Demasio") by New York City police officers. Plaintiff asserts constitutional claims pursuant to 42 U.S.C. § 1983 ("Section 1983") against the individual defendants for false arrest, malicious prosecution, failure to intervene and deliberate indifference; a *Monell* claim against the City of New York for the same constitutional violations; and analogous claims under New York City Law against the individual defendants, and against the City of New York under the doctrine of *respondeat superior*. Plaintiff seeks compensatory and punitive damages, costs, disbursements, and attorney's fees pursuant to applicable state, municipal, and federal civil rights law.

1

**JURISDICTION**

2. This action is brought pursuant to 42 U.S.C. § 1983 and 42 U.S.C. § 1988 and the Fourth Amendment to the United States Constitution. Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331, 1343 (a)(3) and (a)(4), this being an action seeking redress for the violation of Plaintiff's constitutional and civil rights.

3. Plaintiff further invokes this Court's supplemental jurisdiction, pursuant to 28 U.S.C. § 1367, over any and all non-federal claims and causes of action which derive from the same nucleus of operative facts and are part of the same case or controversy which gives rise to the federally based claims and causes of action.

**VENUE**

4. Venue is proper in the United States District Court for the Southern District of New York pursuant to 28 U.S.C. § 1391(b) because the acts complained of occurred in this district.

**JURY DEMAND**

5. Plaintiff respectfully demands a trial by jury on each and every one of his claims as pled herein, pursuant to Fed. R. Civ. P. 38(b).

**PARTIES**

6. The individually named defendants, Detective Michael DeFalco (Shield No. 12425), Detective Jose Rojas, and John Does (collectively, the "individual defendants"), are and were at all times relevant herein officers, employees, and agents of the New York City Police Department ("NYPD").

7. On the date of the incident giving rise to this complaint, the individual defendants were assigned to the NYPD 26th Precinct.

8. Each individual defendant is sued in his or her individual and official capacity. At all times mentioned herein, each individual defendant acted under the color of state law, in the capacity of an officer, employee, and agent of defendant City of New York ("Defendant City").

9. Defendant City is a municipality created and authorized under the laws of New York State. It is authorized by law to maintain, direct, and supervise the NYPD, which acts as its law enforcement agent and for which it is ultimately responsible.

## STATEMENT OF FACTS

10. In or around August 2022, Plaintiff's brother, Bubu Demasio ("Bubu"), began a calculated pattern of false police reports against Plaintiff. Some of these complaints were officially filed in their octogenarian mother's name, despite her documented cognitive impairment.

11. Motivated by a desire to exclude Plaintiff from the family's rent-stabilized apartment in Morningside Heights and take over through succession rights, Bubu sought to manipulate the criminal justice system as a tool for personal leverage and control.

12. In 2022, Bubu initiated an *ex parte* order of protection through Family Court as part of his scheme, exploiting their mother, Dorcas Demasio ("Ms. Demasio"), who was in her late 80s with dementia, and signed a petition that he filled out.

13. During the Family Court proceedings in New York County (Docket No. O-061-37-22), Plaintiff obtained his own order of protection against Bubu, alleging harassment, primarily through the weaponization of the police with false complaints.

14. In accordance with the mutual orders of protection that were extended on April 19, 2023, by Court Referee Gail A. Adams during an exclusion trial, Plaintiff was

3

ordered to stay away from Bubu's and Ms. Demasio's home at "519 West 121st Street, Apt. 4C." Bubu was simultaneously ordered to stay away from Plaintiff.

15. The Family Court proceedings—which included testimony from Dorcas's close friends and relatives about Bubu's electronic impersonation and isolation of his octogenarian mother—revealed Bubu's single-minded quest to seize exclusive control over the family's rent-stabilized apartment.

16. Before June 14, 2023, Bubu had made at least three unsubstantiated complaints against Plaintiff to officers and detectives at the 26th Precinct, including Detective Vincent Signoretti ("Detective Signoretti").

17. Bubu's complaints—often acting as a proxy for his vulnerable elderly mother—entailed (i) August 9, 2022 allegation of criminal mischief that Detective Signoretti investigated and concluded no crime had taken place, declining to bring any charges against Plaintiff, (ii) August 15, 2022 unsubstantiated allegation that Plaintiff accosted his mother, and (iii) April 4, 2023 false accusation that Plaintiff had violated the order of protection against her by being present at their gym.

18. By the summer of 2023, Bubu had established a reputation within the 26th Precinct for aggressively seeking to expose the Plaintiff to criminal liability, which would have helped secure a permanent stay-away order.

19. At the time, Plaintiff was a 55-year-old writer with no criminal background or arrest history; he was well-regarded in his Morningside Heights community.

20. On June 14, 2023, Bubu made a complaint to the 26th Precinct that Plaintiff "stared" at him in front of their apartment building, at 519 West 121st Street.

21. This allegation, aside from being fabricated, failed to constitute a crime or violate the Family Court order of protection.

22. Nevertheless, based solely on Bubu's accusation—notwithstanding his documented history of false and frivolous police reports against his brother—detectives from the 26th Precinct issued an investigation card ("I card") for Plaintiff.

23. On July 14, 2023, Detective Michael DeFalco ("Detective DeFalco") telephoned Plaintiff to convey a determination of probable cause based solely on Bubu's allegations. Plaintiff denied the incident, emphasized that the accusation was fabricated, and urged Detective DeFalco to consult Detective Signoretti for full context on Bubu's documented history of false complaints. Plaintiff also pointed out his own Family Court order of protection against Bubu—highlighting the incongruence of violating such an order through a "staredown" that required Bubu's equally violating presence. Plaintiff further encouraged DeFalco to obtain security footage from Columbia University, the landlord, for the building where the alleged incident occurred, and expressed his intention to formally file a complaint regarding Bubu's pattern of false reports. Detective DeFalco acknowledged Plaintiff's right to do so by visiting the 26th Precinct.

24. After his phone call with Detective DeFalco, Plaintiff texted Detective Signoretti to draw attention to Bubu's pattern of false complaints: "How many times is [Bubu] allowed to make false reports without any consequence?" and "At what point [will] your precinct stop enabling my brother from filing reports with zero proof?"

25. Plaintiff texted similar concerns to Detective DeFalco and reiterated that merely checking the security footage would prove to be exculpatory.

26. On July 15, 2023, around 6:30 p.m., Plaintiff visited the 26th Precinct in an attempt to report—and stop—his brother Bubu's false police reports.

27. Without prompting, the officer at the front desk that day—Officer Perez—called Bubu's conduct toward Plaintiff "harassment." Detective DeFalco—a police officer training to be a detective—was notified that the Plaintiff wanted to speak with him.

28. Detective DeFalco came downstairs from the Detective Squad office with Detective Jose Rojas ("Detective Rojas"). When Plaintiff tried to explain the impossibility of the allegation, the two officers revealed that Plaintiff was under arrest for violating the Family Court order of protection in Bubu's favor.

29. Plaintiff reminded the detectives about Bubu's history of making false accusations and motives to lie; Plaintiff also reminded the officers that at 55 years old, he had never been arrested and was being falsely accused once again by a malevolent brother intent on taking over their mother's prized apartment.

30. Plaintiff suggested that they speak with their colleague, Detective Signoretti, who was familiar with Bubu's patterns of mendacity.

31. Plaintiff also pointed out that even if the purported "staring" had occurred, it would have constituted no crime; that he and Bubu shared the same neighborhood and, under the terms of their mutual Family Court orders of protection, they were forbidden from going to each other's current homes, but nothing prevented Plaintiff from traveling freely in the neighborhood.

32. Plaintiff implored the detectives to look at the video footage; Columbia University, which owned the building where the allegation occurred, had security

cameras on the exterior; if the detectives simply viewed those readily available videos, they would see that on the date and time of the alleged "staring" incident, Plaintiff was not there.

33. But Plaintiff's statements and pleas fell upon deaf ears. Detectives DeFalco and Rojas had already decided to arrest Plaintiff; they processed his arrest at the precinct (Arrest No. M23624795).

34. In the face of Plaintiff's protestations of innocence, Detectives DeFalco and Rojas stated that they had "no choice" but to arrest Plaintiff the moment he entered the precinct. Detective DeFalco expressed surprise that Plaintiff had kept his word about visiting the precinct. "Why did you come here?" DeFalco asked.

35. As Detective Rojas stated, it was an "automatic arrest."

36. During Plaintiff's arrest processing, Detective DeFalco stated multiple times that he had "no choice" but to proceed with Plaintiff's arrest; he said that he "didn't want to do this" and, noting Plaintiff's lack of any criminal history, referred to Plaintiff as a "good guy."

37. When Judith Walker, the Plaintiff's friend, visited the precinct to pick up his belongings, the officers repeated their rationalizations to her—that they were required to arrest him.

38. Detective DeFalco also stated to Plaintiff that if surveillance footage disproved Bubu's account, he would recommend charging him with filing a false complaint.

39. Detective Rojas—who was assigned to be Plaintiff's arresting officer—sought to distance himself from the investigation of Plaintiff's conduct, stating, "This wasn't my case."

40. Neither DeFalco nor Rojas actually believed that Plaintiff had harassed or threatened Bubu, or posed any kind of danger; the detectives asserted that they were obligated to arrest Plaintiff based on departmental policy and practice.

41. Moreover, when Plaintiff explained (correctly) that the Family Court stay-away order of protection applied to complainant's home—his apartment unit, not the surrounding neighborhood—DeFalco and Rojas incorrectly asserted that Plaintiff's merely being in the area constituted a violation of the order of protection.

42. During Plaintiff's arrest processing, Detective Signoretti entered the Detective Squad's interrogation room and remarked, "Your brother seems to have a hard-on to get you in trouble," but agreed with his colleagues that the arrest was justified under NYPD rules.

43. After the arrest processing at the precinct, Plaintiff was transported to Central Booking in Lower Manhattan. He was detained in a filthy, rodent-infested cells—with other arrestees urinating and defecating on benches and floors near him—as he awaited his arraignment before the presiding criminal court judge.

44. On July 16, 2023, Plaintiff was arraigned on Docket Number CR-020398-23NY, charged with Criminal Contempt in the second degree, under New York Penal Law Section 215.50(3).

45. According to the Criminal Court complaint, "Police Officer Michael Defalco" was "informed by Bubu Demasio" that on June 14, 2023, "at about 03:10 PM, in front of

519 West 121 Street" in Manhattan, "the defendant [Plaintiff Nunyo Demasio] was standing at the above-described location staring at him." The Complaint further alleges that "[t]he defendant's conduct is in direct violation of a Valid Order of Protection issued in Family Court on April 19, 2023, by Judge Gail A. Adams, docket number O-06137-22, and which remains in effect until August 1, 2023." The signature line at the bottom of the Criminal Court complaint bears Defalco's signature and is dated "7/15/2023," with time "22:00."

46.    The presiding judge at Plaintiff's arraignment—Judge Jonathan Svetkey—issued a temporary order of protection (in response to the prosecution's request), but he noted that Plaintiff had an absolute right to travel freely in his neighborhood ("You're allowed to do what you normally do in your day-to-day life"); the order of protection required that Plaintiff avoid communicating with Bubu or going to Bubu's apartment – it unequivocally did not bar Plaintiff from being on the same block as 519 West 121st Street.

47.    Judge Svetkey issued the following instruction to the assigned prosecutor at Plaintiff's arraignment: "Make a note in your file to your colleagues, and make sure they get it, understanding that these two people [Plaintiff and Bubu] live in the same neighborhood and will likely run into each other, and that's not a violation [of the order of protection]."

48.    Judge Svetkey also released Plaintiff on his own recognizance, but ordered that Plaintiff return to Criminal Court on a future date; otherwise, a warrant would be issued for Plaintiff's arrest.

49. Plaintiff fulfilled all his court obligations, returning to Criminal Court on the required dates, until the prosecution was dismissed and sealed on October 18, 2023.

50. During the course of the prosecution, Plaintiff's defense attorney, Maggie Taylor, obtained the surveillance videos outside Bubu's building. The footage confirmed Plaintiff's innocence, showing that at 3:17 p.m. on June 14, 2023 (the time and date of the "staring" incident, according to Bubu), he is seen exiting his building and walking alone down the block; Plaintiff is not present, and at no point does Bubu express any kind of reaction.

51. After the prosecution concluded, Plaintiff continued to seek police intervention to stop Bubu's pattern of false accusations. Plaintiff sent a formal letter to Captain Jose Taveras—the Commanding Officer of the 26th Precinct—and Chief of Detectives Joseph Kenny, placing the NYPD on notice of brother's serial false reporting, which resulted in constitutional violations by Detective DeFalco.

52. In an email dated May 16, 2024, Detective Signoretti explained Plaintiff's July 2023 arrest, writing: "*PO DeFalco investigated the case to the best of his ability and was caught between our regulations for Domestic Incidents with OOPs and testimony of a victim/witness.*"

53. Soon after Bubu filed another false complaint on behalf of Ms. Demasio that Plaintiff violated a stay-away order that didn't exist, Plaintiff wrote a letter to Detective DeFalco on May 19, 2024. Plaintiff stated he was following up on the officer's representation that he would consider charging Bubu with making a false complaint: It "could serve as a deterrent while ensuring he understands the seriousness of the matter,

especially exploiting our mom." However, Detective DeFalco never responded to the letter or a follow-up email.

54. The statements and actions of the defendant officers at the 26th Precinct signaled that they were expected to automatically arrest in cases involving alleged violations of orders of protection—regardless of the plausibility of the allegations, without conducting basic investigative steps, and without corroborating the allegations through readily available evidence, even in the absence of urgency or exigency. As Detective Rivera explained to Plaintiff, one reason for the policy favoring automatic arrest was to prevent the possibility that those individuals might subsequently commit "serious crimes" against the complainant—reflecting a policy based on risk management rather than an individualized analysis of probable cause.

55. As a result, the defendant detectives failed to do one of the most essential functions of their job: use their common sense and professional judgment. They neglected to assess Bubu's credibility, understand the context of the relationship between Plaintiff and Bubu, ask clarifying questions, obtain corroboration, and take other reasonable steps (such as reviewing the exculpatory surveillance video).

56. In addition, because of their automatic decision to arrest, the defendant officers disregarded Bubu's history of unsubstantiated complaints at their precinct, failed to seek any information from the detective in their precinct who was most familiar with Bubu and Plaintiff (Detective Vincent Signoretti), overlooked Plaintiff's lack of any criminal history (whereas Bubu had at least one prior criminal charge, for a hit-and-run), failed to consider Plaintiff's professional background and demeanor in contrast to

Bubu's, and disregarded the consistency and congruence of Plaintiff's accounts versus the Bubu's inconsistent and incongruent accounts.

57. The defendants' actions and statements made it clear that Plaintiff's arrest on July 15, 2023 was predetermined; there was no investigation or sincere attempt to obtain the truth.

58. Neither the individual defendants, nor anyone else in their precinct or elsewhere in the NYPD, showed any interest or effort to hold Bubu accountable for falsely accusing Plaintiff and getting him arrested and prosecuted; despite the damage this false accusation inflicted upon Plaintiff, despite the substantial waste of resources Bubu's false accusations cause, Bubu has faced zero consequence for falsely accusing Plaintiff.

**PATTERN OF FALSE REPORTS AND INSTITUTIONAL FAILURE TO RESPOND**

59. From August 2022 through late 2024, Bubu exploited NYPD protocols by lodging at least six demonstrably false or frivolous complaints against Plaintiff. These reports—ranging from harassment to criminal contempt—were either consistently unsubstantiated, internally inconsistent, or administratively closed. Yet each prompted a full police response, compelling Plaintiff to repeatedly defend himself against fabricated claims. Although no arrests occurred beyond the false arrest in 2023, the toll from the institutional failure was cumulative: invasive investigations, constant anxiety, and disruption to Plaintiff's personal and professional life. The NYPD's failure to assess credibility or recognize the pattern emboldened Bubu.

60. Even after the June 14, 2023 arrest, the 26th Precinct continued enabling Bubu's abuse of process. Between May and December 2024, he filed increasingly farcical allegations—including that Plaintiff's furniture placement constituted "domestic violence," and that a non-functioning bedroom security camera was criminal (while installing his own surveillance cameras in communal areas). Notwithstanding such implausibility, Detective Rivera and other officers treated these complaints as legitimate. In one case, Detective Rivera dispatched officers to investigate the furniture "incident," despite Bubu previously admitting he had moved the items to Officer Frantz Paul. The NYPD's willingness to act on these claims extended Plaintiff's legal jeopardy and signaled institutional indifference to the manipulation unfolding in plain view.

61. In fall 2024, Rivera telephoned Plaintiff to investigate an innocuous voicemail left on his mother's phone. When Plaintiff questioned the validity of criminalizing ordinary family contact, Rivera acknowledged the absurdity but responded, "What can we do if he files a report?"—then warned him to "be careful." These remarks underscore not just individual failures of judgment, but a broader departmental failure to train officers to distinguish credible allegations from manipulative exploitation. The NYPD's passive complicity enabled Bubu to convert unverified complaints into instruments of harassment, inflicting constitutional injury through a pattern of institutional neglect.

62. On October 29, 2024, Deputy Inspector Jose Taveras—the Commanding Officer of the 26th precinct—returned an email from Plaintiff regarding the latest frivolous allegation orchestrated by Bubu: "I understand your frustration, but please understand that we must take each complaint seriously and we must remain impartial at all times."

63. Ultimately, Plaintiff successfully filed a petition in the New York Supreme Court to appoint a guardian for Ms. Demasio, now 90, who was also victimized by this unchecked campaign. The NYPD's failure to intervene or investigate credibly not only enabled Bubu's false claims—often in her name—but also prolonged the exploitation of a cognitively impaired elder.

**DELIBERATE ACTS UNDER COLOR OF STATE LAW**

64. All of the aforementioned acts of the individual defendants—and their agents, servants, and employees—were carried out under color of state law in the course and scope of their official duties.

65. These acts deprived Plaintiff of rights guaranteed by the Fourth Amendment of the United States Constitution, in violation of 42 U.S.C. § 1983.

66. The individual defendants acted willfully, knowingly, and with the specific intent to deprive Plaintiff of his constitutional rights secured by 42 U.S.C. § 1983, and the Fourth Amendment.

**FAILURE TO TRAIN AND SUPERVISE**

67. Upon information and belief, the individual defendants' aforementioned abuse of power was not an isolated event. There were other instances of misconduct by these officers that Defendant City either knew or should have known about.

68. The NYPD failed to supervise and discipline the individual defendants despite warning signs of malicious or dishonest behavior—ignoring the risk that they would engage in future misconduct, thereby encouraging them to continue to abuse their powers and violate the rights of civilians.

**THE NYPD'S CUSTOM OF ARRESTING ACCUSED CIVILIANS WITHOUT ADEQUATE INVESTIGATION**

69. Although the individual defendants knew—or had every reason to know—that Plaintiff was innocent and the target of a malicious, ill-motivated accusation by Bubu, they arrested Plaintiff anyway. The decision was in accordance with the NYPD's widespread custom and practice of arresting innocent civilians without adequate investigations simply because of criminal accusations against them— as if a mere allegation were sufficient to justify an arrest.

70. Arresting officers frequently admit or imply this policy when they tell arrestees: "They said you assaulted them, so *we have to arrest you*," and "Our job is to arrest you and let the courts figure it out." These statements reflect a *de facto* policy that prioritizes procedural expedience over constitutional safeguards.

**DAMAGES**

71. As a direct and proximate cause of the foregoing acts committed by the Defendants, Plaintiff suffered the following injuries and damages:

   a. Violation of his constitutional rights under the Fourth Amendment to the United States Constitution;
   b. Loss of Liberty
   c. Severe emotional distress, degradation, and suffering.

**SECTION 1983 CLAIMS**

## FIRST CLAIM

### False Arrest Under Section 1983

72. Plaintiff realleges and reiterates all allegations set forth in the preceding paragraphs as if stated fully herein.

73. By the actions described above, the individual defendants deprived Plaintiff of his Fourth Amendment right to be secure in his person against unreasonable searches and seizures, specifically his right to be free from false arrest.

74. As detailed above, the individual defendants intentionally arrested and detained Plaintiff without probable cause, without a warrant, without privilege or consent.

75. As a direct and proximate result of the misconduct and abuse of authority detailed above, Plaintiff sustained the damages and injuries hereinbefore alleged.

## SECOND CLAIM

### Malicious Prosecution Under Section 1983

76. Plaintiff realleges and reiterates all allegations set forth in the preceding paragraphs as if stated fully herein.

77. By the actions described above, Defendants deprived Plaintiff of his Fourth Amendment right to be secure in his person against unreasonable searches and seizures, specifically his right to be free from malicious prosecution.

78. As detailed above, the individual defendants intentionally and maliciously initiated a criminal prosecution against Mr. Demasio without probable cause – a prosecution that terminated in Plaintiff's favor when all criminal charges against him were dismissed.

79. As a direct and proximate result of the misconduct and abuse of authority detailed above, Plaintiff sustained the damages and injuries hereinbefore alleged.

## THIRD CLAIM

### Municipal Liability Under Section 1983

80. Plaintiff realleges and reiterates all allegations set forth in the preceding paragraphs as if stated fully herein.

81. By the actions described, the Defendant City deprived Plaintiff of his constitutional rights through the NYPD's custom, policy, and/or practice of making arrests based solely on civilian accusations without conducting adequate investigations– particularly in cases involving orders of protection.

82. This unconstitutional policy was confirmed in a May 16, 2024 email from Detective Signoretti, explaining that the arresting officer was "*caught between our regulations for Domestic Incidents with OOPs and testimony of a victim/witness*." That admission echoed remarks by multiple officers who conceded that NYPD protocols prioritized internal procedure over individualized probable cause.

83. As a direct and proximate result of the acts of Defendant City, Plaintiff sustained the damages and injuries hereinbefore alleged.

## PENDENT MUNICIPAL CLAIMS

### FIRST CLAIM

### Right of Security Against Unreasonable Search and Seizure and Excessive Force Under New York City Administrative Code

84. Plaintiff realleges and reiterates all allegations set forth in the preceding paragraphs as if stated fully herein.

85. As detailed above, the individual defendants intentionally violated Plaintiff's right to be secure against unreasonable searches and seizures, and against excessive force, in violation of New York City Administrative Code Title 8, Chapter 8: The Right of Security Against Unreasonable Search and Seizure and Against Excessive Force Regardless of Whether Such Force Is Used In Connection with a Search or Seizure. § 8-803 Civil action for deprivation of rights.

86. As a direct and proximate result, Plaintiff sustained the damages and injuries hereinbefore alleged.

## SECOND CLAIM

### Respondeat Superior Under New York Law

87. Plaintiff realleges and reiterates all allegations set forth in the preceding paragraphs as if stated fully herein.

88. Defendant City is the employer of the individual defendants.

89. Under the doctrine of *respondeat superior*, the Defendant City is responsible for the wrongdoing of its employees acting within the scope of their employment.

90. As a direct and proximate result of the acts of the individual defendants detailed above, Plaintiff sustained the damages and injuries hereinbefore alleged.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully demands the following relief, jointly and severally against the Defendants:

  a.  An order awarding compensatory damages in favor of Plaintiff Nunyo Demasio, in an amount to be determined at trial;

  b.  An order awarding punitive damages in an amount to be determined at trial;

  c.  An order enjoining and directing Defendant City of New York to establish proper rules and procedures for arresting individuals based purely on civilian accusations.

  d.  A court order, pursuant to 42 U.S.C. § 1988, that Plaintiff is entitled to reasonable attorney's fees, costs, and disbursements; and

  e.  Such other and further relief as this Court may deem appropriate.

DATED: August 17, 2025  
     New York, New York

CYRUS JOUBIN, ESQ.  
43 West 43rd Street, Suite 119  
New York, NY 10036  
347-349-0724  
joubinlaw@gmail.com  
Attorney for Nunyo Demasio